UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| APEX GROUP CAPITAL ADVISORS LLC f/k/a SANDSPOINT CAPITAL ADVISORS LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> RELATED FUND MANAGEMENT LLC et al., <br><br> *Defendants.* | § § § § § § § § § § § § § § Civil Action No. 3:25-cv-1627-x |

## **MEMORANDUM ORDER AND OPINION**

Before the Court is plaintiff Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC's (Apex) motion for a temporary restraining order (TRO) against defendants Lucas Belinkie, Preston Callen, William C. Chaney, and Ryan Hope (collectively, the "Former Employees"). (Doc. 6).

### I. Background

In 2022, Apex Group Ltd. acquired SandsPoint Capital Advisors LLC (SandsPoint), a consulting firm that works in the private equity, real estate, and investment management sectors. At the time, Related Fund Management LLC (Related Fund) was one of SandsPoint's largest clients. When Apex Group Ltd. acquired SandsPoint, it paid the Former Employees and other key personnel large retention bonuses to keep them and the clients they served, including Related Fund. But during the fourth quarter of 2024—once those bonuses were fully paid—each of the Former Employees left SandsPoint (by then renamed Apex) one-by-one for one of

1

Apex's biggest competitors in Dallas, IQ-EQ US Management Co., LLC (IQ-EQ).  By the end of January 2025, eleven more employees on the Related Fund account resigned from Apex.  And in April, Related Fund followed them.

Apex became suspicious the Former Employees had coordinated with Related Fund to move to IQ-EQ, so Apex investigated whether the Former Employees had taken any confidential information with them when they left.  And Apex alleges they had done so in droves.

While at Apex, the Former Employees each signed employment agreements that contained confidentiality agreements, non-competes, and non-solicitation clauses.  Specifically, the Former Employees agreed (1) "not [to] divulge, furnish, or make available to any third person . . . any trade secrets or other confidential information concerning [Apex . . . or] any of [Apex]'s clients or customers"; (2) during and for twelve months after their employment with Apex, not to "perform any services for any entity that is in competition with the business of [Apex]" in the jurisdictions Apex operates in or has plans to operate in; and (3) "not [to] directly or indirectly . . . include or attempt to induce any employee" to leave Apex.[1]

Between their notices of resignation and their actual departures, each of the four Former Employees downloaded confidential Apex information.  Belinkie downloaded "files concerning Apex's billing practices, personnel, salary, compensation, and clients," and files including security information about Apex's

---

[1] Doc. 6-3 § 4(a)–(c).

acquisition and proprietary database.[2]  Chaney downloaded data about Apex's clients, including Related Fund, along with other proprietary information about Apex employees and compensation.  And Hope and Callen downloaded thousands of files each, many of which contained confidential and trade secret information.

Upon this discovery, Apex issued cease and desist letters to the Former Employees in January.  A week later, the Former Employees responded through counsel that they would return any confidential and trade secret information but would not abide by the non-competes they'd signed.  Apex alleges no confidential information was ever returned.

Apex asks the Court to issue a TRO enjoining the Former Employees from using, disclosing, or retaining any of Apex's confidential information and requiring them to return it.  Additionally, Apex asks the Court to compel the Former Employees to abide by the non-compete they signed by ceasing work on any Related Fund account and refraining from working at any other Apex competitor in the Dallas metroplex for the remainder of the one-year period from their Apex departures.  And finally, Apex asks the Court to prohibit the Former Employees from soliciting any additional Apex employees for the remainder of the one-year period.

---

[2] Doc. 6 at 14.

## II. Legal Standard

TROs serve to preserve the status quo and prevent irreparable harm to the movant so the court can "render a meaningful decision after a trial on the merits."[3] To warrant the extraordinary relief of a TRO, the movant must establish four factors:

> (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.[4]

TROs "should only be granted if the movant has clearly carried the burden of persuasion on all four [elements]."[5] Failure to establish any one of the elements results in denial of the TRO.[6] And "a party requesting a preliminary injunction must generally show reasonable diligence."[7]

## III. Analysis

Apex's requested TRO relief relates back to its claims for misappropriation of trade secrets under state and federal law and for breach of the employment agreements it entered with each of the Former Employees. The Court turns first to Apex's trade secret claims.

---

[3] *Canal Auth. of Fla. V. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

[4] *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015).

[5] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (articulating the standard a court should apply when considering preliminary injunctions, which use the same standard as TROs).

[6] *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250 (5th Cir. 2009).

[7] *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).

### A. Confidential and Trade Secret Information

### 1. Likelihood of Success on the Merits

The first element for a TRO requires the movant to show a substantial likelihood of success on the merits of his case. "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment."[8]

Both the Federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act, under which Apex brings claims against the Former Employees, require plaintiffs to show (1) the existence of a trade secret; (2) that the trade secret was misappropriated; and (3) that the misappropriated trade secret was used without authorization.[9]

"A trade secret is information which derives independent economic value from being not generally known or readily ascertainable through proper means."[10] And "[a]t the [TRO] stage, a court does not determine that the information at issue is a trade secret; rather, it determines whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits."[11]

---

[8] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

[9] *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022); *see also El Paso Disposal, LP v. Ecube Labs Co.*, 766 F. Supp. 692, 711 (W.D. Tex. 2025) (collecting cases considering claims under the Federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act together).

[10] *CAE Integrated, L.L.C.*, 44 F.4th at 262 (citing Tex. Civ. Prac. & Rem. Code § 134A.002(6) and 18 U.S.C. § 1839(3)).

[11] *Comp. Scis. Corp. v. Tata Consulting Servs. Ltd.*, 2019 WL 2058772, at *3 (May 9, 2019) (Lindsay, J.) (cleaned up).

Apex presents a prima facie case in its complaint, TRO motion, and supporting exhibits that the information the Former Employees downloaded contained trade secrets. Apex details the lengths to which it goes to protect this information from general access and dissemination,[12] and the competitive advantage the information grants Apex.

The information the Former Employees took contained "guidelines and templates for employee recruiting, bullet points for a pitch for new business, and draft statements of work," as well as files with names like "RFM/Valuation Review/2024/2024 09 30/Support/3Q 24 Debt Valuation Analysis_vSP.xlsx."[13] As a consulting firm, Apex certainly derives value from data and analytics about its clients and plans to acquire new ones.

Apex also makes a prima facie case as to misappropriation and use of those trade secrets. It presents details about the Former Employees downloading the relevant data before leaving the company to work for a competitor in the same market for the same major client. This is sufficient at this stage to establish likelihood of success on the merits.

### 2.  Irreparable Harm

The second element is irreparable harm. "[T]he central purpose of a [TRO] . . . is to prevent irreparable harm. It is the threat of harm that cannot be

---

[12] Doc. 6 at 6 ("For example, Apex (and the Apex Group of companies) utilize password-protected, secure, cloud-based systems, networks, and computers to store and maintain confidential information and trade secrets. . . . Apex further limits employee access to its confidential information and trade secrets to what is reasonably needed to perform their duties on behalf of Apex.").

[13] Doc. 6 at 15–16.

undone which authorizes exercise of this equitable power to enjoin before the merits are fully determined."[14]  "Thus only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction."[15]  And the plaintiff must have more than an unfounded fear of harm.[16]

Apex establishes that it suffers irreparable harm from its trade secrets being exposed to one of its main competitors.  "Courts have frequently recognized that the disclosure of confidential information to the public or a competitor greatly diminishes the value of that information and is difficult to quantify in money damages."[17]  And as this Court has noted in the past, "because [IQ-EQ] is [Apex]'s competitor, disclosure—and thus irreparable harm—becomes more likely."[18]

The Former Employees argue Apex's potential harm is not imminent and irreparable because it has been over six months since Apex first discovered the breach.  But it took quick action in sending cease and desist letters to the Former Employees in January, and the Former Employees replied a week later that they would return the misappropriated information.  So, even though Apex alleges they never did return the information, this is sufficient explanation for Apex's delay.

---

[14] *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975).

[15] *Canal Auth.*, 489 F.2d at 573.

[16] *Kidd v. Dir. Of Fed. Bureau of Prisons*, 2020 WL 759298, at *4 (N.D. Tex. Feb. 14, 2020) (Kacsmaryk, J.) (citing *Holland v. Am. Ins. Co. v. Succession of Roy*, 77 F.2d 992, 997 (5th Cir. 1985)).

[17] *Frank Surveying Co., Inc. v. Harp*, 2023 WL 172034, at *5 (N.D. Tex. Jan. 11, 2023) (Starr, J.) (collecting cases).

[18] *Id.*

### 3. Balancing Harm

When considering the third element for a TRO, the Court weighs the harm the plaintiff would face without a TRO to the harm a TRO would cause the defendant.[19] Here, Apex's request merely requires the Former Employees to comply with a duty they already have: to maintain the confidentiality of Apex's trade secret information. And the Former Employees claim they "certified to their current employer, IQ-EQ, that they did not possess or use any Apex confidential information, and [did] not intend to use any such Apex confidential information in the future."[20]

Thus, the burden of ordering the return of Apex's information is minimal while Apex's harm in having its client and personnel data—essentially, its product as a consulting firm—in the hands of a competitor is significant. Therefore, this element weighs in Apex's favor.

### 4. Effect on the Public Interest.

Finally, the narrow injunction at issue in ordering the return of Apex's information does not harm the public interest. It does not impair the Former Employees' ability to work for their current employer, and if trade secrets really have been misappropriated as Apex argues they have, the public benefits from the general protection of trade secrets and the enforcement of federal and state laws like the Federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act.

---

[19] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." (cleaned up)).

[20] Doc. 14 at 8.

Therefore, the Court **GRANTS** Apex's TRO request as to the trade secret claims.

### B.    Noncompete and Non-solicitation

Next, the Court turns to Apex's requests for the Court to enforce the noncompete and non-solicitation provisions from Apex's employment agreements with the Former Employees.

Apex does establish that the Former Employees began working for a competitor in the same market within twelve months of leaving Apex. It is less clear whether they impermissibly solicited Apex employees to leave. But regardless, Apex loses on the second, third and fourth TRO elements.

Much of the irreparable harm Apex may have faced from the Former Employees' alleged breaches of their employment agreements has long since occurred. The "breach of non-compete covenants" may be "the epitome of irreparable injury,"[21] but Apex discovered over six months ago that the Former Employees had moved to IQ-EQ. Apex points to the fact that it filed a suit against the Former Employees back in January and only dismissed it when they assured Apex they'd return the information.[22] Apex also notes that it continued to learn of employees having gone to IQ-EG after it dismissed its suit.[23]

---

[21] *Brink's Inc. v. Patrick*, 2014 WL 2931824, at *7 (N.D. Tex. June 27, 2014) (Boyle, J.) (cleaned up).

[22] Doc. 6 at 12, 16; *see also* Doc. 15 at 2 (pointing out that Apex filed suit against IQ-EQ and the Former Employees in the Northern District of Texas back in January and then voluntarily dismissed its suit); *Apex Grp. Cap. Advisors LLC v. IQEQ US Mgmt. Co. LLC*, 3:25-cv-260-E.

[23] Doc. 6 at 22–23.

But even so, the Former Employees made clear in their January response to Apex's cease and desist letters that they had no intention of honoring the noncompete and considered it unenforceable, and Apex offers no explanation as to why it refrained from enforcing its noncompete and non-solicitation agreements with the Former Employees when it knew they had no plans to comply.

Apex says it "is not asking [the Former Employees] to leave their jobs at IQ-EQ."[24] But even so, preventing them from working for Related Fund through the end of 2025 (since the last Former Employee to leave Apex did so in December 2024) would likely harm the Former Employees more than it could benefit Apex. The damage of these alleged breaches has largely been done. Even if the Former Employees solicited the other eleven Apex deserters to leave, they are long gone. And Apex alleges that the primary potential harm from working for a competitor in the same market—namely, poaching a whale of a client—has also already been done.

Therefore, the Court **DENIES** Apex's requested TRO as to the non-compete and non-solicitation provisions.

## IV.  Conclusion

TROs are extraordinary relief. Apex presents sufficient evidence to warrant that extraordinary relief as to its requests regarding trade secrets but not as to the noncompete and non-solicitation agreements. The Court **GRANTS IN PART** as to Apex's request to enjoin the Former Employees from using, disclosing, or retaining Apex's confidential and trade secret information, but the Court **DENIES IN PART**

---

[24] Doc. 6 at 23.

as to Apex's request to enforce the non-compete and non-solicitation provisions against the Former Employees.

To the extent the Former Employees have any of Apex's confidential and trade secret information in their custody, the Court **ORDERS** them to return such information to Apex and refrain from using or disseminating it further. But the Court will not order the Former Employees to stop working on any accounts at their current jobs or refrain from working for other competitors in the Dallas market.

The relief in this temporary order expires on July 21, 2025, at 5:00 PM.

**IT IS SO ORDERED** this 7th day of July, 2025.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE