UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| APEX GROUP CAPITAL ADVISORS LLC f/k/a SANDSPOINT CAPITAL ADVISORS LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> RELATED FUND MANAGEMENT LLC et al., <br><br> *Defendants.* | § § § § § § § § § § § § § § § Civil Action No. 3:25-CV-1627-X |

## MEMORANDUM ORDER AND OPINION

The Court previously entered a temporary restraining order in favor of Apex Group Capital Advisors LLC (Apex) and against defendants Lucas Belinkie, Preston Callen, William C. Chaney, and Ryan Hope (collectively, the "Former Employees"). The temporary relief expires on August 4, 2025.

Apex now asks the Court for a preliminary injunction against the Former Employees. (Doc. 35). The Court **GRANTS** the injunction, converting its prior temporary restraining order with little alteration.

### I. Background

The Court summarized the background of this case in its temporary restraining order, but it will recount the facts here. In 2022, Apex Group Ltd. acquired SandsPoint Capital Advisors LLC (SandsPoint), a consulting firm that works in the private equity, real estate, and investment management sectors. At the time, Related Fund Management LLC (Related Fund) was one of SandsPoint's largest

1

clients. When Apex Group Ltd. acquired SandsPoint, it paid the Former Employees and other key personnel large retention bonuses to keep them and the clients they served, including Related Fund. But during the fourth quarter of 2024—once those bonuses were fully paid—each of the Former Employees left SandsPoint (by then renamed Apex) one-by-one for one of Apex's biggest competitors in Dallas, IQ-EQ US Management Co., LLC (IQ-EQ). By the end of January 2025, eleven more employees on the Related Fund account resigned from Apex. And in April, Related Fund followed them to IQ-EQ.

Apex became suspicious the Former Employees had coordinated with Related Fund to move to IQ-EQ, so Apex investigated whether the Former Employees had taken any confidential information with them when they left. And Apex alleges they had done so in droves.

While at Apex, the Former Employees each signed employment agreements that contained confidentiality agreements, non-competes, and non-solicitation clauses. Specifically, the Former Employees agreed (1) "not [to] divulge, furnish, or make available to any third person . . . any trade secrets or other confidential information concerning [Apex . . . or] any of [Apex]'s clients or customers"; (2) during and for twelve months after their employment with Apex, not to "perform any services for any entity that is in competition with the business of [Apex]" in the jurisdictions Apex operates in or has plans to operate in; and (3) "not [to] directly or indirectly . . . include or attempt to induce any employee" to leave Apex.[1]

---

[1] Doc. 37 § 4(a)–(c).

2

Between their notices of resignation and their actual departures, each of the four Former Employees downloaded confidential Apex information. Belinkie downloaded "files concerning Apex's billing practices, personnel, salary, compensation, and clients," and files including security information about Apex's acquisition and proprietary database.[2] Chaney downloaded data about Apex's clients, including Related Fund, along with other proprietary information about Apex employees and compensation. And Hope and Callen downloaded thousands of files each, many of which contained confidential and trade secret information.

Upon this discovery, Apex issued cease and desist letters to the Former Employees in January. A week later, the Former Employees responded through counsel that they would return any confidential and trade secret information but would not abide by the non-competes they'd signed. Apex alleges no confidential information was ever returned.

Apex asks the Court to enjoin the Former Employees from using, disclosing, or retaining any of Apex's confidential information and requiring them to return it. Additionally, Apex asks the Court to compel the Former Employees to abide by the non-compete they signed by ceasing work on any Related Fund account and refraining from working at any other Apex competitor in the Dallas metroplex for the remainder of the one-year period from their Apex departures. And finally, Apex asks the Court to prohibit the Former Employees from soliciting any additional Apex employees for the remainder of the one-year period.

---

[2] Doc. 36 at 12.

## II. Legal Standard

Preliminary injunctions serve to preserve the status quo and prevent irreparable harm to the movant so the court can "render a meaningful decision after a trial on the merits."[3] The movant must establish "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest."[4] And "a party requesting a preliminary injunction must generally show reasonable diligence."[5]

## III. Analysis

Apex's requested injunctive relief relates back to its claims for misappropriation of trade secrets under state and federal law and for breach of the employment agreements it entered with each of the Former Employees. The Court turns first to Apex's trade secret claims.

### A.  Confidential and Trade Secret Information

#### 1.  Likelihood of Success on the Merits

The first element for a preliminary injunction requires the movant to show a substantial likelihood of success on the merits of his case. "To show a likelihood of

---

[3] *Canal Auth. of Fla. V. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

[4] *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997); *see also Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 20 (2008).

[5] *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).

4

success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment."[6]

Both the Federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act, under which Apex brings claims against the Former Employees, require plaintiffs to show (1) the existence of a trade secret; (2) that the trade secret was misappropriated; and (3) that the misappropriated trade secret was used without authorization.[7]

"A trade secret is information which derives independent economic value from being not generally known or readily ascertainable through proper means."[8] And at this preliminary stage, "a court does not determine that the information at issue is a trade secret; rather, it determines whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits."[9]

Apex presents a prima facie case in its complaint, preliminary injunction motion, and supporting exhibits that the information the Former Employees downloaded contained trade secrets. Apex details the lengths to which it goes to

---

[6] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

[7] *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022); *see also El Paso Disposal, LP v. Ecube Labs Co.*, 766 F. Supp. 692, 711 (W.D. Tex. 2025) (collecting cases considering claims under the Federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act together).

[8] *CAE Integrated, L.L.C.*, 44 F.4th at 262 (citing Tex. Civ. Prac. & Rem. Code § 134A.002(6) and 18 U.S.C. § 1839(3)).

[9] *Comp. Scis. Corp. v. Tata Consulting Servs. Ltd.*, 2019 WL 2058772, at *3 (May 9, 2019) (Lindsay, J.) (cleaned up).

protect this information from general access and dissemination,[10] and the competitive advantage the information grants Apex.

The information the Former Employees took contained "guidelines and templates for employee recruiting, bullet points for a pitch for new business, and draft statements of work," as well as files with names like "SandsPoint Pricing RFM."[11] As a consulting firm, Apex certainly derives value from data and analytics about its clients and plans to acquire new ones.

Apex also makes a prima facie case as to misappropriation and use of those trade secrets. It presents details about the Former Employees downloading the relevant data before leaving the company to work for a competitor in the same market for the same major client. This is sufficient at this stage to establish likelihood of success on the merits.

### 2.     Irreparable Harm

The second element is irreparable harm. "[T]he central purpose of a preliminary injunction . . . is to prevent irreparable harm. It is the threat of harm that cannot be undone which authorizes exercise of this equitable power to enjoin before the merits are fully determined."[12] "Thus only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can

---

[10] Doc. 36 at 3 ("For example, Apex (and the Apex Group of companies) utilize password-protected, secure, cloud-based systems, networks, and computers to store and maintain confidential information and trade secrets. . . . Apex further limits employee access to its confidential information and trade secrets to what is reasonably needed to perform their duties on behalf of Apex.").

[11] Doc. 36 at 13–14.

[12] *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975).

properly justify a preliminary injunction."[13] And the plaintiff must have more than an unfounded fear of harm.[14]

Apex establishes that it suffers irreparable harm from its trade secrets being exposed to one of its main competitors. "Courts have frequently recognized that the disclosure of confidential information to the public or a competitor greatly diminishes the value of that information and is difficult to quantify in money damages."[15] And as this Court has noted in the past, "because [IQ-EQ] is [Apex]'s competitor, disclosure—and thus irreparable harm—becomes more likely."[16]

The Former Employees argue Apex's potential harm is not imminent and irreparable because it has been over six months since Apex first discovered the breach. But it took quick action in sending cease and desist letters to the Former Employees in January, and the Former Employees replied a week later that they would return the misappropriated information. So, even though Apex alleges they never did return the information, this is sufficient explanation for Apex's delay.

### 3. Balancing Harm

When considering the third element for a preliminary injunction, the Court weighs the harm the plaintiff would face without an injunction to the harm such

---

[13] *Canal Auth.*, 489 F.2d at 573.

[14] *Kidd v. Dir. Of Fed. Bureau of Prisons*, 2020 WL 759298, at *4 (N.D. Tex. Feb. 14, 2020) (Kacsmaryk, J.) (citing *Holland v. Am. Ins. Co. v. Succession of Roy*, 77 F.2d 992, 997 (5th Cir. 1985)).

[15] *Frank Surveying Co., Inc. v. Harp*, 2023 WL 172034, at *5 (N.D. Tex. Jan. 11, 2023) (Starr, J.) (collecting cases).

[16] *Id.*

injunction would cause the defendant.[17] Here, Apex's request merely requires the Former Employees to comply with a duty they already have: to maintain the confidentiality of Apex's trade secret information. And the Former Employees claim they "certified to their current employer, IQ-EQ, that they did not possess or use any Apex confidential information, and [did] not intend to use any such Apex confidential information in the future."[18]

Thus, the burden of ordering the return of Apex's information is minimal while Apex's harm in having its client and personnel data—essentially, its product as a consulting firm—in the hands of a competitor is significant. Therefore, this element weighs in Apex's favor.

### 4. Effect on the Public Interest.

Finally, the narrow injunction at issue in ordering the return of Apex's information does not harm the public interest. It does not impair the Former Employees' ability to work for their current employer, and if trade secrets really have been misappropriated as Apex argues they have, the public benefits from the general protection of trade secrets and the enforcement of federal and state laws like the Federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act.

Therefore, the Court **GRANTS** Apex's request for a preliminary injunction as to the trade secret claims.

---

[17] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." (cleaned up)).

[18] Doc. 39 at 6.

## B. Noncompete and Non-solicitation

Next, the Court turns to Apex's requests for the Court to enforce the noncompete and non-solicitation provisions from Apex's employment agreements with the Former Employees.

Apex establishes that the Former Employees began working for a competitor in the same market within twelve months of leaving Apex. It is less clear whether they impermissibly solicited Apex employees to leave. But regardless, Apex loses on the second, third, and fourth preliminary injunction elements.

Much of the irreparable harm Apex may have faced from the Former Employees' alleged breaches of their employment agreements has long since occurred. The "breach of non-compete covenants" may be "the epitome of irreparable injury,"[19] but Apex discovered over six months ago that the Former Employees had moved to IQ-EQ. Apex points to the fact that it filed a suit against the Former Employees back in January and only dismissed it when they assured Apex they'd return the information.[20] Apex also notes that it continued to learn of employees having gone to IQ-EQ and that, once Related Fund left Apex for IQ-EQ, Apex realized Related Fund may have conspired with the Former Employees.[21]

This provides some explanation for Apex's delay in enforcing its rights against the Former Employees after they made clear in January that they had no intention

---

[19] *Brink's Inc. v. Patrick*, 2014 WL 2931824, at *7 (N.D. Tex. June 27, 2014) (Boyle, J.) (cleaned up).

[20] *Apex Grp. Cap. Advisors LLC v. IQEQ US Mgmt. Co. LLC*, 3:25-cv-260-E.

[21] Doc. 41 at 7.

of honoring the noncompete and considered it unenforceable. But as the Court noted in its temporary restraining order, the biggest threat it faces from employees leaving to join a competitor has already happened—losing a major client that follows the employees.

Apex does not ask the Court to enjoin the Former Employees from working at IQ-EQ entirely, but even so, preventing them from working for Related Fund through the end of 2025 (since the last Former Employee to leave Apex did so in December 2024) would likely harm the Former Employees more than it could benefit Apex. The damage of these alleged breaches has largely been done. And the Former Employees must turn over any confidential or trade secret information they still have from Apex, so they cannot use such information while servicing Related Fund for IQ-EQ.

However, enjoining the Former Employees from soliciting any additional Apex employees to move to IQ-EQ will not cause the Former Employees any harm, while not doing so could harm Apex significantly. Since Apex has now justified its delay in exercising its non-solicitation rights, the Court will grant an injunction now even though it did not previously.

Therefore, the Court **DENIES** Apex's requested preliminary injunction as to the non-compete provision but **GRANTS** as to the non-solicitation.

## IV.  Conclusion

Preliminary injunctions are extraordinary relief. Apex presents sufficient evidence to warrant that extraordinary relief as to its requests regarding trade secrets but not as to the noncompete and non-solicitation agreements. The Court

**GRANTS IN PART** as to Apex's request to enjoin the Former Employees from using, disclosing, or retaining Apex's confidential and trade secret information, or from soliciting any additional employees to leave Apex for IQ-EQ. But the Court **DENIES IN PART** as to Apex's request to enforce the non-compete provision against the Former Employees.

As the Court previously ordered in its temporary restraining order, the Former Employees must also return any confidential or trade secret information belonging to Apex. To the extent the Former Employees still have any of Apex's confidential and trade secret information in their custody, the Court **ORDERS** them to return such information to Apex and refrain from using or disseminating it further.

The Court also **ORDERS** the Former Employees to refrain from soliciting any additional employees away from Apex for the remainder of their respective twelve-month terms. But the Court will not order the Former Employees to stop working on any accounts at their current jobs or refrain from working for other competitors in the Dallas market.

**IT IS SO ORDERED** this 4th day of August, 2025.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE